**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

LISA JACOBS,

|                              | Plaintiff,          | 1:22-cv-1184 |
|------------------------------|---------------------|--------------|

v.

HUDSON VALLEY FAMILY PHYSICIANS,
PLLC, AMIN ELASHKER, D.O., in his
individual capacity also known as Amen
Elashker, D.O., and FRANCESCA HILMI,
D.O., in her individual capacity,

                                           Defendants.

---

Russell G. Wheeler, Esq., *for Plaintiff*
Brooke D. Youngwirth-Bodin, Esq., *for Defendants*

**Hon. Elizabeth C. Coombe, United States District Judge:**

### MEMORANDUM-DECISION AND ORDER

Plaintiff Lisa Jacobs brings this action against Defendants Hudson Valley Family Physicians, PLLC (HVFP), Amin Elashker, and Francesca Hilmi, asserting claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (Title VII) and the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq. (NYSHRL) arising out of her former employment at HVFP. *See* Dkt. No. 1. Presently before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. Dkt. No. 44. The motion is fully briefed. Dkt. Nos. 46, 47, 48, 49, 50, 51. For the following reasons, Defendants' motion is denied.

I.    BACKGROUND[1]

A.    The Parties

Defendant HVFP is a professional limited liability corporation which operated medical practice offices at 117 Mary's Avenue and 1089 New York Highway 32 in Kingston, New York. Dkt. No. 44-2 ¶¶ 2-3; Dkt. No. 48 ¶¶ 2-3. Defendants Amin Elashker, D.O. and Francesca Hilmi, D.O. are both physicians of osteopathic medicine and, at all relevant times, were principals and co-owners of HVFP. Dkt. No. 44-2 ¶¶ 5-8; Dkt. No. 48 ¶¶ 5-8.

Plaintiff was employed by HVFP from September 2008 until July 15, 2020. *See* Dkt. No. 44-2 ¶ 4; Dkt. No. 48 ¶ 4. Over the course of her employment, Plaintiff held the positions of special projects person, assistant manager, and practice manager. Dkt. No. 44-10 at 21, 24, 30; *see also* Dkt. No. 48 ¶¶ 59-61; Dkt. No. 51 ¶¶ 59-61. This case arises out of alleged sexual harassment and retaliation Plaintiff suffered when she was employed at HVFP on the part of Dr. Elashker.

B.    Physical Contact

Plaintiff testified that Dr. Elashker forcibly kissed her at work, in the elevator, parking garage, office, and exam room. Dkt. No. 44-10 at 94-95. "Every time" Dr. Elashker would kiss her, Plaintiff would "push him back" and tell him to stop. *Id.* at 97. Dr. Elashker would also touch her breasts, although Plaintiff could not identify how many times or recall specifically when this occurred. *Id.* at 103-04. Plaintiff used Dr. Elashker as her personal physician. *Id.* at 100. Plaintiff asserts that, once the sexual harassment started, she "no longer saw him as a patient in the exam

---

[1] The following facts are drawn from Defendants' Statement of Undisputed Material Facts, Dkt. No. 44-2, Plaintiff's Rule 56 Statement in Response and Opposition to Defendants' Statement of Material Facts, Dkt. No. 48, and Defendants' Response to Plaintiff's Additional Material Facts, Dkt. No. 51, to the extent those facts are well-supported by pinpoint citations to the record, and the exhibits the parties have submitted. Disputed facts are noted. The facts are construed in the light most favorable to Plaintiff as the non-moving party. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

room," although Dr. Elashker continued to order labs and prescribe medications for her. *Id.* at 100-01.

Plaintiff also testified that Dr. Elashker would "show up" to parties after work, "forcibly kiss" and touch her, and "follow [them] around." *Id.* at 109; *see id.* at 187-200 (describing one such incident). At Christmas parties, Dr. Elashker would "try to catch [Plaintiff] in a room by [her]self, or afterwards." *Id.* at 109. For one Christmas party, he bought Plaintiff jewelry and "made [her] wear the necklace to the party." *Id.* at 111.

Plaintiff generally testified that she is "sure" that the claimed sexual harassment "happened [her] entire employment" at HVFP. *Id.* at 105; *see id.* at 211 (testifying that the events were "ongoing" and there was "no end date to his harassment"). Dr. Elashker would say things to her like "I'll take you to the right places" or "[r]emember who always has your back." *Id.* at 184-85. Plaintiff understood Dr. Elashker to mean that if she "put up with" and "continued with" the touching, kissing, and gifts, that she would "advance" and "go great places." *Id.* at 186-87. Plaintiff also testified that there "were many repercussions if [she] didn't do or act how [Dr. Elashker] wanted." *Id.* at 112. If Plaintiff refused to do as he wanted, Dr. Elashker would make comments like "we have a problem here" and "we can end this real quick," in essence "remind[ing] [Plaintiff] how much [she] needed this job." *Id.* at 112-13. Dr. Elashker "made numerous comments throughout the years that [Plaintiff was] only employed because of him." *Id.* at 114.

Dr. Elashker, by contrast, denies ever subjecting Plaintiff to physical advances, sexual commentary, or sexual harassment. Dkt. No. 44-8 at 183. Dr. Elashker asserts that he never forcibly kissed Plaintiff or kissed her in a romantic way. *Id.* at 180. He denies ever touching Plaintiff's breast or genitals and asserts that Plaintiff never touched his genitals. *Id.* Dr. Elashker testified that he never made inappropriate comments of a sexual nature to Plaintiff and denies

3

advising Plaintiff that she would be able to advance at HVFP by tolerating inappropriate conduct. *Id.* at 181-82.

### C.    Gifts

Plaintiff asserts that Dr. Elashker "sporadic[ally]" gave her money in addition to her compensation from HVFP. Dkt. No. 44-10 at 40-41. Dr. Elashker gave her this money for "working beyond [her] job duties," to "buy something for [her]self," or "because he felt bad for acting a certain way." *Id.* at 42-43. Some of the things Dr. Elashker told Plaintiff to buy with the money were a "bottle of wine," "some nice lingerie," "nice underwear," and "nice jewelry." *Id.* at 45. Dr. Elashker gave Plaintiff these payments throughout her employment. *Id.* at 44. Dr. Elashker also "left lingerie in [her] drawer one time from Victoria's Secret" with a "little note . . . that was signed by him." *Id.* at 51. Every time Dr. Elashker left her something, "there was a conversation" and Plaintiff asked him not to leave her things. *Id.* at 51-52.

Dr. Elashker denies giving Plaintiff lingerie or any "gifts of a sexual or romantic nature." Dkt. No. 44-8 at 184.

### D.    Text Messages

According to Plaintiff, Dr. Elashker sent her inappropriate photographs by text message, including pictures of himself without a shirt on and of his genitals. Dkt. No. 44-10 at 128. Beginning in the late spring and early summer of 2020, Dr. Elashker also sent photographs of himself at hotels and restaurants. *Id.* at 216. Plaintiff alleges that Dr. Elashker also sent messages with these pictures suggesting that, had she "played her cards right," Plaintiff could have been enjoying such experiences with him. *Id.* at 219.

Dr. Elashker testified that he never sent Plaintiff sexually explicit text messages, pictures of his genitals, or other inappropriate messages. Dkt. No. 44-8 at 180, 183-84. He also asserts that

4

he did not text Plaintiff pictures of himself at hotels and restaurants in New York City or pictures of himself in "relaxed and suggest[ive] poses." *Id.* at 187.

Defendants submitted with their motion the text messages between Plaintiff and Dr. Elashker that Plaintiff produced during discovery. *See* Dkt. No. 46-1. The text messages produced are from April 2018 to July 2020 and span more than 600 pages. *See id.* On April 15, 2020, Dr. Elashker sent Plaintiff a picture of a Corona beer. *Id.* at 475. The text messages produced otherwise contain no pictures of Dr. Elashker in hotels or restaurants or in relaxing or suggestive poses, or other inappropriate photographs. Plaintiff testified at her deposition that "[t]here were a lot more text messages" that she no longer has, because they were deleted or lost. *See* Dkt. No. 44-10 at 65. For example, Plaintiff testified that her ex-boyfriend deleted certain text messages because "he is a very jealous, controlling person." *Id.* at 67-68. She also testified that she may have deleted certain text messages "if it was something truly inappropriate." *Id.* at 70.

Plaintiff also testified that she sent Melissa Moore, a former HVFP employee, "copies of text messages and asked her to save them." *Id.* at 60; *see id.* at 72, 181-82. When deposed, Ms. Moore, who worked at HVFP between 2011 and 2015, testified that she could not say "one way or another" whether she ever had possession of text messages between Plaintiff and Dr. Elashker that had been shared with her. Dkt. No. 44-11 at 43-44.[2]

### E.    Conversation with Dr. Hilmi

Plaintiff testified that she and Dr. Hilmi had a conversation in 2018 or 2019 about Dr. Elashker's conduct. Dkt. No. 44-10 at 60-61. According to Plaintiff, Dr. Hilmi said that she "saw

---

[2] Ms. Moore generally testified that Plaintiff and Dr. Elashker were "good friends" and that she never "saw anything that made [Plaintiff] uncomfortable" while Ms. Moore worked at HVFP. Dkt. No. 44-11 at 37-38. She stated that she had no knowledge of the conduct complained of by Plaintiff. *See id.* at 76-81.

all of the [text] messages from Melissa [Moore]" and "felt bad" for Plaintiff for having to "live like this, and work like this, with the harassment from Dr. Elashker." *Id.* at 62. Plaintiff told Dr. Hilmi that Dr. Elashker "would force [her] to kiss him" or "kiss [her] in the elevator, in an exam room, any chance he had." *Id.* at 93. Plaintiff also told Dr. Hilmi that Dr. Elashker would touch her breast or leg and buy her unwanted gifts. *Id.* They had a "continued conversation, with Dr. Elashker present sometimes, about the whole thing" over the next few weeks. *Id.* at 62.

Dr. Hilmi testified that Plaintiff never made a complaint of sexual harassment or discrimination to her. Dkt. No. 44-9 at 61-62. According to Dr. Hilmi, she and Plaintiff never met regarding text messages between Dr. Elashker and Plaintiff. *Id.* at 62. Dr. Hilmi generally disclaims any knowledge of inappropriate conduct on Dr. Elashker's part toward Plaintiff. *Id.* at 62-64.

### F.     Plaintiff's Separation from Employment

It is undisputed that Plaintiff's employment with HVFP ended on July 15, 2020. Plaintiff testified that, leading up to that day, she and Dr. Elashker had a "few conversations" about his "sexual harassment, his innuendos, his controlling me." Dkt. No. 44-10 at 75. A few weeks before July 15, 2020, Plaintiff told Dr. Elashker that she "wasn't happy with the way things were going" and "wasn't going to continue that any longer." *Id.* Dr. Elashker replied that he "would accept [her] resignation at any time." *Id.* at 76. It is unclear if Plaintiff's testimony refers to a text message conversation with Dr. Elashker on June 14, 2020 in which Plaintiff denied disrespecting Dr. Elashker, stated "I have had your back since day one," and "informally" tendered her resignation. Dkt. No. 46-1 at 1-2. Dr. Elashker responded, in part: "If this is how my manager is behaving then I no longer want her to have MY BACK." *Id.* at 2; *see also id.* at 3 ("I[']m selling the practice[. ] No one will have a job as soon as it's sold.").

Plaintiff testified that, on July 15, 2020, she and Dr. Elashker had a "quick conversation" during which Plaintiff said that she was "only an employee" moving forward and that she did not "want to hear any of [Dr. Elashker's] personal life" or be subject to "any more sexual comments, touches, gifts, [or] anything of that nature." Dkt. No. 44-10 at 76. Dr. Elashker denies having a meeting with Plaintiff on or before this date where Plaintiff complained of sexual harassment. Dkt. No. 44-8 at 188.

Later in the day on July 15, Drs. Elashker and Hilmi met with Plaintiff and her daughter, Breanna Jacobs, who also worked at HVFP. *See* Dkt. No. 44-10 at 81. It is undisputed that Dr. Elashker recorded the meeting on his cell phone. Dkt. No. 44-6 (audio recording of meeting). Dr. Elashker stated that the meeting had to do with Drs. Elashker and Hilmi "thinking very seriously about selling the business." *Id.* at 2:52-2:58. Dr. Elashker stated that a "broker" had mandated certain changes prior to selling the business. *Id.* at 3:21-3:29. Among those changes, which were listed on a written memorandum that Dr. Elashker gave Plaintiff, was the elimination of Plaintiff's and her daughter's positions. *Id.* at 7:13-7:45; *see also* Dkt. No. 44-5 (July 15, 2020 memorandum stating that HVFP had approved "[e]liminating the position of General Practice Manager (Currently held by Lisa Jacobs)" and "[e]liminating [t]he position of Assistant Manager (Currently held by Brean[n]a Jacobs)" as part of a "major restructuring"). Dr. Elashker informed Plaintiff and her daughter that HVFP was hoping to implement the changes by August 10, 2020, and then stated: "I would like you to tell me whether you are interested in staying until then or . . . think about it. Sleep on it and see what you want to do." Dkt. No. 44-6 at 10:09-10:23. Dr. Elashker then asked if there were any questions and concluded the meeting. *Id.* at 10:30-10:40.

Dr. Elashker testified at his deposition that Plaintiff would still have a job at HVFP after the elimination of her position, and that it was "understood" that there would be further meetings

or discussion regarding what her new role might be. *See* Dkt. No. 44-8 at 32-34; *see id.* at 151 ("I wanted to hear it from them. I wanted to hear what their ideas are, what their thoughts are."). Plaintiff believed, based on the conversation at the meeting and the memorandum which indicated that her position was being eliminated, that she was being terminated. Dkt. No. 44-10 at 83. Plaintiff believed she had been given a choice whether to leave that day or on August 10. *See id.* at 89. Plaintiff emailed Drs. Elashker and Hilmi that evening: "As a result of our meeting today as well as the letter you provided regarding the termination of my employment with Hudson Valley Family Physicians as of today (verbally) or August 10, 2020 ([a]s stated on paper) I would like to inform you that today July 15, 2020 will be my last day." Dkt. No. 44-7.

## II.    LEGAL STANDARD

Under Rule 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an

essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## III.    DISCUSSION

Plaintiff asserts claims under Title VII and the NYSHRL for sex-based hostile work environment, quid pro quo sexual harassment, sex discrimination, and retaliation. *See* Dkt. No. 1 ¶¶ 63-111 (first through eighth causes of action).[3] Defendants move for summary judgment on all of Plaintiff's claims. Dkt. No. 44.

---

[3] By Decision and Order dated March 20, 2024, District Judge David N. Hurd dismissed all claims brought by Plaintiff's daughter, Breanna Jacobs. *See* Dkt. No. 27.

#### A.    Timeliness

Defendants first argue that Plaintiff's hostile work environment, quid pro quo harassment, and discrimination[4] claims are time-barred because Plaintiff cannot point to evidence of actionable conduct occurring within the relevant limitations periods. Dkt. No. 44-16 at 6-8. Plaintiff responds that the record contains sufficient evidence from which the jury could find that the conduct she complains of continued throughout her employment and that the continuing violation doctrine applies to her claims. Dkt. No. 49 at 9-10. Both parties assert that the limitations period for Plaintiff's Title VII claims extends from June 24, 2020 until her termination on July 15, 2020 (i.e., 300 days before Plaintiff mailed her charge of discrimination to the EEOC) and that the time period for her NYSHRL claims extends from April 20, 2018 until her termination.[5]

Defendants first argue that Plaintiff has "no evidence" other than her own "self-serving testimony" that Defendants engaged in any inappropriate conduct during the limitations period. Dkt. No. 44-16 at 7. Defendants have cited no authority to support the argument that a plaintiff must have evidence corroborating her testimony to survive summary judgment. Indeed, at summary judgment, a plaintiff is "entitled to rely on [her] own testimony to establish [her] claim."

---

[4] It is unclear how, if at all, Plaintiff's discrimination claims (third and seventh causes of action) differ from her hostile work environment and/or quid pro quo claims. The parties do not address the discrimination claims independently, so neither does the Court.

[5] These are the dates calculated by Judge Hurd in his Decision and Order on Defendants' motion to dismiss. Dkt. No. 27 at 8. It appears that Judge Hurd, in calculating the three-year limitations period for Plaintiff's NYSHRL claims, looked back three years from the date Plaintiff mailed her EEOC charge. Although courts in this Circuit have concluded the limitations period for NYSHRL claims is tolled during the pendency of a complaint filed with the EEOC, *see Schneider v. Wal-Mart Stores, Inc.*, No. 16-cv-2010, 2019 WL 294309, at *3 (S.D.N.Y. Jan. 23, 2019), this calculation does not account for the time period between the EEOC's issuance of a right-to-sue letter on August 12, 2022 and the filing of the complaint on November 10, 2022, when the limitations period is not tolled. The parties do not address tolling. Because the exact date of the limitations period for Plaintiff's NYSHRL claims is not dispositive on Defendants' motion, the Court assumes without deciding that April 20, 2018 is the correct date.

*Knox v. CRC Mgmt. Co.*, 134 F.4th 39, 48 (2d Cir. 2025) (citations and ellipsis omitted). To hold that a nonmovant's "allegations of fact are (because 'self-serving') insufficient to fend off summary judgment would be to thrust the courts—at an inappropriate stage—into an adjudication of the merits." *Id.* at 49 (citation omitted). Thus, the Court will not reject Plaintiff's sworn deposition testimony just because it is self-serving, and her testimony may be sufficient to defend against Defendants' motion.

Plaintiff testified at her deposition that Dr. Elashker's "unwanted kissing, touching, making [her] touch him, sending [her] photos, you know, inappropriate text messages, things like that" "all occurred [during her] entire employment." Dk. No. 44-10 at 216; *see also id.* at 105, 211 (describing the events as "ongoing" with "no end date to his harassment"). This sworn testimony is evidence from which a jury could reasonably conclude that the alleged unwanted kissing, physical contact, and inappropriate text messages occurred after April 2018. To the extent Defendants challenge Plaintiff's testimony as insufficiently specific, the Second Circuit has held that "specific descriptions of each instance of harassment—which, if harassment occurred daily, could be difficult to provide—are unnecessary for a plaintiff to defeat summary judgment." *Knox*, 134 F.4th at 52 n.5 (noting that a jury "could reasonably find pervasive harassment, even in the absence of specific details about each incident").

The Court also concludes that disregarding Plaintiff's deposition testimony on the ground that it is contradicted by the text messages produced, as Defendants argue, is not warranted. *See* Dkt. No. 44-16 at 8, 11-12; Dkt. No. 50 at 6-7. Defendants rely primarily on *Bentley v. AutoZoners, LLC*, where the Second Circuit noted that "in the rare circumstance where the plaintiff relies almost exclusively on her own testimony, much of which is contradictory and incomplete, to establish a triable issue of fact, it may well be impossible for the court to determine whether the jury could

11

reasonably find for the plaintiff, and thus whether there are any genuine issues of material fact, without making some assessment of the plaintiff's account." 935 F.3d 76 (2d Cir. 2019) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005)) (internal quotation marks and brackets omitted). A court must find the "record contradictions with [the plaintiff's] testimony 'inescapable and unequivocal' to find that her testimony raised only 'a sham issue of fact.'" *Id.* (citation omitted). Where, however, "there is a plausible explanation for discrepancies in a witness's testimony, the court considering a summary judgment motion should not disregard the later testimony because of an earlier account that was ambiguous, confusing, or simply incomplete." *Frost v. N.Y. City Police Dep't*, 980 F.3d 231, 246 (2d Cir. 2020) (citation and brackets omitted).

Here, the Court concludes that the absence of inappropriate texts from Dr. Elashker in the text messages Plaintiff disclosed does not warrant disregarding Plaintiff's testimony that she received such text messages as a matter of law. Plaintiff testified at her deposition that her ex-boyfriend deleted certain text messages and that she deleted text messages if it was "something truly inappropriate." Dkt. No. 44-10 at 65-68, 70. Plaintiff has therefore provided a plausible explanation for the absence of inappropriate text messages in her possession which a jury could reasonably credit. *See Frost*, 980 F.3d at 247-48 ("There are any number of benign or malign explanations for the purported deficiencies raised by defendants, and it is not the role of the district court to choose among them at the summary judgment stage."); *see also Burns v. Primary PartnerCare Mgmt. Grp., Inc.*, No. 23-cv-6312, 2026 WL 693507, at *4-5 (E.D.N.Y. Mar. 12, 2026) (distinguishing the "rare circumstance" to which *Jeffrey* applies and noting that the defendants' arguments as to the plaintiff's "credibility problems . . . only underscore the reasons why summary judgment is inappropriate").

12

Under the continuing violation doctrine, if a plaintiff files a charge "that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (citation omitted). Because Plaintiff has proffered evidence of actionable conduct within the limitations period, her hostile work environment claim is actionable even to events falling outside the limitations period. The parties disagree about whether the continuing violation doctrine applies to Plaintiff's quid pro quo claims. Because the Court understands Plaintiff's quid pro quo claims to be premised on the adverse action she allegedly suffered when she rejected Dr. Elashker's conduct in July 2020, *see infra* Section III.B, Plaintiff's quid pro quo is timely and the continuing violation doctrine has no application.

Accordingly, Defendant' motion for summary judgment on the ground of untimeliness is denied.

### B.    Harassment Claims

Plaintiff's harassment claims invoke both quid pro quo sexual harassment and sex-based hostile work environment theories. "Although the terms 'quid pro quo' and 'hostile work environment' do not appear in the text of Title VII, they are useful to distinguish between 'cases involving a threat which is carried out and [cases involving] offensive conduct in general.'" *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2005) (quoting *Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 57 (2d Cir. 2004)). Thus, when a plaintiff "proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII." *Id.* (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753-54 (1998)). Where a claim is premised on "unfulfilled threats," however, "it should be categorized as a hostile work environment claim which requires a showing of severe or

13

pervasive conduct." *Id.* ("The terms quid pro quo and hostile work environment are helpful, perhaps, in making a rough demarcation between cases in which threats are carried out and those where they are not or are absent altogether, but beyond this are of limited utility.") (citations omitted).

Defendants move for summary judgment on Plaintiff's hostile work environment and quid pro quo claims. Although the parties' briefing does not always clearly distinguish between these two theories of liability, based on the conceptualization outlined in *Schiano*, the Court understands Plaintiff's quid pro quo claim to be based on her alleged termination after she told Dr. Elashker to cease his inappropriate conduct and her hostile work environment claim to be based on all other alleged inappropriate conduct, including unfulfilled threats.

### 1.    Hostile Work Environment

Defendants move for summary judgment on Plaintiff's hostile work environment claims, arguing that (1) any gifts from Dr. Elashker do not support a hostile work environment claim, and (2) Plaintiff has no evidence to support her claim other than her own testimony, which is contradicted by the text messages. Dkt. No. 44-16 at 9-12.

To establish a hostile work environment claim under Title VII, Plaintiff must demonstrate harassment on the basis of a protected characteristic, and that her "workplace was 'so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of . . . her employment were thereby altered.'" *Agosto v. N.Y. City Dep't of Educ.*, 982 F.3d 86, 101 (2d Cir. 2020) (quoting *Desardouin v. City of Rochester*, 708 F.3d 102, 105 (2d Cir. 2013)).[6] The

---

[6] Although the parties state that this standard also applies to hostile work environment claims under the NYSHRL, that is no longer the case. The NYSHRL was amended in 2019 to remove the "severe or pervasive" requirement for discrimination claims. *See Smith v. Nat'l Grid USA*, No. 21-cv-6899, 2025 WL 1248676, at *11 (E.D.N.Y. Apr. 30, 2025). The NYSHRL prohibits "harassment" because of an individual's sex "regardless of whether such harassment would be considered severe or pervasive under precedent applied to harassment claims," and such

hostile work environment standard includes "both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014). To determine whether conduct is "severe or pervasive," courts review "the totality of the circumstances," including "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Banks v. General Motors, LLC*, 81 F.4th 242, 262 (2d Cir. 2023) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). Moreover, there must be a "specific basis for imputing the conduct creating the hostile work environment to the employer." *Bentley*, 935 F.3d at 90-91.

As set forth above, *supra* Section III.A, the Court rejects Defendants' arguments that Plaintiff necessarily needs evidence other than her own sworn testimony to survive summary judgment and that her testimony that Dr. Elashker sent her inappropriate text messages should be disregarded as a matter of law. Although Defendants also argue that the gifts Plaintiff claims Dr. Elashker gave her were not sexual in nature and do not support a hostile work environment, *see* Dkt. No. 44-1-6 at 9-11, this argument ignores portions of Plaintiff's testimony. For example, Plaintiff testified that Dr. Elashker—her supervisor who undisputedly had the power to fire her—gave her Victoria's Secret lingerie and would also give her money, telling her to buy herself "some

---

harassment is unlawful "when it subjects an individual to inferior terms, conditions or privileges of employment" because of a protected characteristic. N.Y. Exec. Law § 296(1)(h) ("It shall be an affirmative defense to liability under this subdivision that the harassing conduct does not rise above the level of what a reasonable victim of discrimination with the same protected characteristic . . . would consider petty slights or trivial inconveniences."). Because the Court concludes that Defendants are not entitled to summary judgment on Plaintiff's Title VII hostile work environment claim, they are also not entitled to summary judgment under the NYSHRL's more liberal standard.

nice lingerie" or "nice underwear." Dkt. No. 44-10 at 45, 51. Thus, at a minimum there are questions of fact as to whether the gifts were related to Plaintiff's sex.

Further, as Plaintiff points out in opposition, she testified to additional conduct on Dr. Elashker's part over the course of her employment at HVFP, including unwanted and forcible kissing, unwanted touching of Plaintiff's breasts, and inappropriate and sexually explicit text messages. *See supra* Section I. Plaintiff also testified that she subjectively suffered emotionally due to this conduct. *See, e.g.*, Dkt. No. 44-10 at 120, 157, 159-60. According to Plaintiff, Dr. Elashker's conduct was accompanied by insinuations that he would help her career if she went along with his conduct and potentially fire her if she did not. *See id.* at 112-13, 184-87. Defendants do not address this alleged conduct, other than to argue that Plaintiff does not have evidence corroborating her testimony. Defendants therefore have not demonstrated that they are entitled to summary judgment as a matter of law on Plaintiff's hostile work environment claim. *See, e.g.*, *E.E.O.C. v. Suffolk Laundry Servs., Inc.*, 48 F. Supp. 3d 497, 515 (E.D.N.Y. 2014) (noting that the law "deems unwanted touching to be a highly significant factor contributing to a hostile work environment") (citation omitted); *Conlan v. Liberty Mutual Grp., Inc.*, No. 23-cv-8947, 2024 WL 4792112, at *5 (S.D.N.Y. Nov. 13, 2024) ("The Second Circuit has held that direct contact with an intimate body part constitutes one of the most severe forms of sexual harassment.") (collecting cases).

Accordingly, the Court denies Defendants' motion for summary judgment on Plaintiff's hostile work environment claim.

### 2.    Quid Pro Quo

It appears that Plaintiff's quid pro quo claim is based on the allegation that Dr. Elashker "used Plaintiff's July 2020 ultimatum that his conduct cease as the basis for the decision to terminate her." Dkt. No. 49 at 13. Defendants argue that they are entitled to summary judgment on

16

this claim because they have proffered a "legitimate, non-discriminatory reason" for the July 15, 2020 meeting and Plaintiff cannot establish pretext. *See* Dkt. No. 50 at 8-11; Dkt. No. 44-16 at 10-11.

To establish a quid pro quo claim, a plaintiff "must show a 'tangible employment action,' i.e., that an 'explicit . . . alteration[] in the terms of conditions of employment' resulted from her refusal to submit" to unwanted sexual advances. *Schiano*, 445 F.3d at 604 (citation omitted); *see also Karibian v. Columbia Univ.*, 14 F.3d 773, 777 (2d Cir. 1994) ("[T]o establish a *prima facie* case of *quid pro quo* harassment, a plaintiff must present evidence that she was subject to unwelcome sexual conduct, and that her reaction to that conduct was then used as the basis for decisions affecting the compensation, terms, conditions or privileges of her employment."). A tangible employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Mormol*, 364 F.3d at 57 (citation omitted). A tangible employment action "in most cases inflicts direct economic harm," but "there is no requirement that it *must* always do so." *Id.* (citations omitted).

To succeed on a Title VII discrimination claim, a plaintiff must prove "discrimination either by direct evidence of intent to discriminate or, more commonly, by indirectly showing circumstances giving rise to an inference of discrimination." *Bart v. Golub Corp.*, 96 F.4th 566, 569 (2d Cir. 2024) (citation and internal quotation marks omitted). "When only circumstantial evidence of discriminatory intent is available, courts use the *McDonnell Douglas* burden-shifting framework to assess whether the plaintiff has shown sufficient evidence of discrimination to survive summary judgment." *Id.* (citation omitted). At the first step of the *McDonnell Douglas* framework, a plaintiff must meet the "not onerous" burden of establishing a prima facie case of

discrimination. *See id.* at 570. Once the plaintiff has done so, the "burden shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its adverse action." *Id.* (citation omitted). If the employer does so, the burden then "shifts back to the plaintiff to prove that the employer's stated reason was pretext for discrimination." *Id.* (citations omitted).

Importantly, a plaintiff can establish an unlawful employment practice under Title VII by demonstrating that the plaintiff's protected characteristic "was a motivating factor" for an employment practice, "even though other factors also motivated the practice." *Id.* at 571 (quoting 42 U.S.C. § 2000e-2(m)). Thus:

> To satisfy the third-stage burden under *McDonnell Douglas* and survive summary judgment in a Title VII disparate treatment case, a plaintiff may, but need not, show that the employer's stated reason was false, and merely a pretext for discrimination; a plaintiff may also satisfy this burden by producing other evidence indicating that the employer's adverse action was motivated at least in part by the plaintiff's membership in a protected class.

*Id.* at 576; *see id.* at 575 (noting that a plaintiff may "show that the employer's stated reason— even if true or factually accurate—was not the 'real reason,' in the sense that it was not the *entire* reason due to a coexisting impermissible consideration").

It is unclear whether Plaintiff is pursuing a traditional single-motive, pretext theory of liability for her quid pro quo claim or a "mixed-motives" theory, and the parties do not address the appropriate causation standard for Plaintiff's quid pro quo claim. In any event, the Court concludes that there is evidence from which a jury could reasonably conclude that Plaintiff's sex, and more specifically her rejection of Dr. Elashker's alleged inappropriate sexual conduct, was a motivating factor for the July 15, 2020 meeting and the elimination of Plaintiff's position at HVFP. Plaintiff testified that she and Dr. Elashker had a "few conversations" about his alleged harassment in the weeks leading up to the meeting in which Plaintiff expressed her dissatisfaction with the status

18

quo and that she "wasn't going to continue that any longer." Dkt. No. 44-10 at 75-76. According to Plaintiff, she and Dr. Elashker had a conversation the morning of July 15, 2020 in which she said she was "only an employee" moving forward and personal conversations, sexual comments, touches, and gifts had to cease. *Id.* Given the extremely close temporal proximity between Plaintiff's rejection of Dr. Elasherk's sex-related conduct and advances, a jury could reasonably conclude that Plaintiff's sex played a motivating factor in the decision to eliminate her position, even if other factors also motivated the decision. *See Bart*, 96 F.4th at 576 (noting that although "the plaintiff's ultimate burden may be carried by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, it may often be carried by reliance on the evidence comprising the prima facie case, without more, if that evidence is independently sufficient under step three of *McDonnell Douglas*") (citation and internal quotation marks omitted).

Accordingly, Defendants have not demonstrated their entitlement to summary judgment on Plaintiff's quid pro quo claims.

### C. Retaliation Claims

Defendants also move for summary judgment on Plaintiff's retaliation claims. To establish a prima facie case of retaliation under Title VII and the NYSHRL, a plaintiff must show "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (citation omitted); *see also Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 312-13 (2004).

#### 1. Protected Activity

Defendants appear to argue that Plaintiff did not engage in any protected activity because the conversation between Dr. Elashker and Plaintiff "was not regarding a sexual or romantic

19

context." *See* Dkt. No. 44-16 at 13. Plaintiff responds that her refusal of Dr. Elashker's alleged sexual harassment constitutes protected activity. Dkt. No. 49 at 14.

The Second Circuit has not yet ruled on whether "merely rejecting a sexual advance is cognizable" as protected activity under Title VII (or the NYSHRL). *See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 115 n.12 (2d Cir. 2013). Other Circuit courts and district courts within this Circuit are split on the issue, although it appears that the majority view is that resisting sexual advances is protected activity. *See Huang v. Ohio State Univ.*, 116 F.4th 541, 562 (6th Cir. 2024) (describing a circuit split and "tak[ing] the majority view" that "[r]ejecting sexual advances—using words or actions—is within the scope of conduct Title VII protects"); *Fay v. City of Newburgh*, No. 21-cv-3140, 2024 WL 4169552, at *10 (S.D.N.Y. Sept. 12, 2024) (collecting cases). Defendants have provided no argument or authority to conclude that resisting sexual advances is not protected activity, and the Court finds no reason to depart from the majority view.

Moreover, there is evidence from which a jury could reasonably conclude that Plaintiff engaged in protected activity by telling Dr. Elashker on July 15, 2020 that she was "only an employee" moving forward and did not want to be subjected to "any more sexual comments, touches, gifts, [or] anything of that nature." Dkt. No. 44-10 at 76. Thus, contrary to Defendants' argument, the jury could find that a "conversation regarding Dr. Elashker's conduct toward Plaintiff took place." Dkt. No. 44-16 at 13.

### 2.    Adverse Employment Action

Defendants next argue that Plaintiff did not suffer any retaliatory adverse employment action because she was not terminated but rather resigned voluntarily upon learning that HVFP was restructuring. Dkt. No. 44-16 at 13, 16. Defendants point to Dr. Elashker's deposition testimony that HVFP was open to retaining Plaintiff in a different role and that he intended there to be further discussions about what that role might be. *See id.*; Dkt. No. 50 at 14; Dkt. No. 44-8

20

at 32-34, 151. Plaintiff responds that her separation from employment was an involuntary termination. Dkt. No. 49 at 16-17. Relying on the recording of the July 15, 2020 meeting, Plaintiff argues that Defendants expressly told Plaintiff her position was being eliminated, that neither Dr. Elashker nor Dr. Hilmi invited discussion about an alternative role, and that Dr. Elashker ended the meeting. *Id.*

The Court concludes that, at a minimum, there is a genuine question of fact as to whether Plaintiff's employment was terminated on July 15, 2020 and whether Plaintiff reasonably understood it to have been terminated. Although Dr. Elashker stated at the meeting "I would like you to tell me whether you are interested in staying until then or . . . think about it. Sleep on it and see what you want to do," this statement came directly after advising Plaintiff that HVFP wanted to implement the restructuring changes, including the elimination of Plaintiff's position, by August 10, 2020. Dkt. No. 44-6 at 10:09-10:23. Furthermore, when Plaintiff emailed Drs. Elashker and Hilmi on the evening of July 15 referencing "the termination of [her] employment" and electing July 15 as her last day, neither Dr. Elashker nor Dr. Hilmi corrected Plaintiff's apparent misunderstanding that she was not being terminated or invited further discussion about alternative roles. Thus, a reasonable jury could conclude that Plaintiff was involuntarily terminated from her employment at HVFP and suffered an adverse employment action.[7]

### 3.    Causation

Plaintiff's retaliation claims are subject to the same *McDonnell Douglas* burden-shifting framework outlined above. *See supra* Section III.B.2. However, unlike Plaintiff's harassment claims, her retaliation claims "must be proved according to traditional principles of but-for

---

[7] Defendants also argue that Plaintiff "cannot demonstrate constructive discharge to the extent same is being alleged." Dkt. No. 44-16 at 14. Plaintiff does not respond to this argument, and the Court does not understand Plaintiff to be asserting a claim for constructive discharge.

causation, not the lessened [motivating factor] causation test stated in § 2000e-2(m)." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). "[B]ut-for causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013).

Here, Defendants have articulated a legitimate, non-retaliatory reason for the elimination of Plaintiff's position and her termination from HVFP—a restructuring intended to put the company in a position to be sold. Thus, the burden shifts back to Plaintiff to prove that Defendants' stated reason is pretextual and that, absent Defendants' retaliatory motive, her employment would not have ended.

A plaintiff "may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Id.* "From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Id.* (citations omitted).

Here, Plaintiff argues that the "record is replete with discrepancies from which a reasonable [juror] could conclude that Defendants' proffered reason" for the elimination of Plaintiff's position, which led to her separation from employment, was pretext. Dkt. No. 49 at 18-23. First, Plaintiff argues that Defendants' stated reasons for the restructuring have shifted over time. The July 15, 2020 memorandum stated that the restructuring was "[i]n response to the major and unprecedented circumstances and the impact of the COVID-19 pandemic on the health care industry" and "due to the prohibitive cost of operation." Dkt. No. 44-5. At the July 15, 2020 meeting, however, Dr. Elashker focused on his and Dr. Hilmi's desire to sell HVFP, an idea which

22

they had been thinking about since at least the previous year but which came into focus when Dr. Hilmi got sick with COVID-19. *See generally* Dkt. No. 44-6. Furthermore, both Dr. Elashker and Dr. Hilmi testified at their depositions that the restructuring was not driven by financial concerns. *See* Dkt. No. 44-8 at 42 (Dr. Elashker denying that "achieving a cost savings was the primary objective of implementing the changes set forth in the July 15th, 2020 memo"); Dkt. No. 44-9 at 45-46 (Dr. Hilmi denying that there was "any financial rationale for the changes that are listed" in the July 15, 2020 memo).

Second, Plaintiff argues that Dr. Elashker's statements to Plaintiff that they were working with a broker to sell the business and that the broker had mandated certain changes were false. At his deposition, Dr. Elashker testified that the broker was someone with whom he had a 45-minute virtual conversation and that the broker only "suggested" certain changes. *See* Dkt. No. 44-8 at 122-25. Dr. Elashker also testified that the broker did not "suggest eliminating the position of general practice manager." *Id.* at 131.

Plaintiff also argues that Defendants had listed the second-floor office space at HVFP's Mary's Avenue location before the pandemic and that a reasonable factfinder could infer pretext from Defendants' decision to record the July 15, 2020 meeting because there is a question of fact as to whether it was their usual policy to record such events. Dkt. No. 49 at 21-23.

Defendants generally respond that the record evidence "shows that the decision to restructure was motivated by the combined effects of the COVID-19 pandemic, Dr. Hilmi's illness, and the partners' pre-existing plan to sell the practice, not by any retaliatory motive." Dkt. No. 50 at 11-14. Defendants argue that Plaintiff's theory requires the factfinder to "believe that Defendants orchestrated an elaborate, multi-year conspiracy . . . all to terminate one employee." *Id.* at 12.

23

Viewing the evidence and drawing reasonable inferences therefrom in the light most favorable to Plaintiff, the Court concludes that there is evidence from which a jury could reasonably conclude that Defendants' stated reason for the elimination of Plaintiff's position was pretextual and that retaliatory motive was a but-for cause of the decision. Specifically, Plaintiff has proffered evidence that (1) Defendants' stated justification for the restructuring changes varied, including relative to whether the changes were due to financial constraints; (2) the unidentified broker Dr. Elashker met with did not "mandate" any specific personnel changes and did not specifically suggest that Plaintiff's position be eliminated; (3) the only positions to be eliminated were those of Plaintiff, Plaintiff's daughter, and a nurse who had already left HVFP; and (4) as of November 2025, HVFP had not been sold. This evidence, coupled with the extremely close temporal proximity between Plaintiff's alleged protected conduct and the elimination of her position, could reasonably allow a jury to infer pretext. *See Winslow v. Pulaski Academy*, 448 F. Supp. 3d 197, 214-15 (N.D.N.Y. 2020) (finding question of fact on retaliation claim where the plaintiff proffered evidence that, inter alia, there was "close temporal proximity," the defendants acted inconsistently with claimed "'budgetary reductions' for abolishing her position," the "nature and amount of [the employer's] work" did not change after her position was abolished, and she was "the only administrative employee to have her position abolished during the . . . school year").

Accordingly, Defendants' motion for summary judgment on Plaintiff's retaliation claims is denied.

### D.      Individual Defendants' Liability Under NYSHRL

Finally, Defendants argue that neither Dr. Elashker nor Dr. Hilmi can be held personally liable under the NYSHRL. Dkt. No. 44-16 at 16-17.[8] Defendants argue that Dr. Elashker "cannot

---

[8] Defendants also ask the Court to dismiss Plaintiff's Title VII claims to the extent they are asserted against Drs. Elashker and Hilmi. *Id.* In opposition, Plaintiff confirms that she "does not plead or

be held liable as an aider and abettor of his own actions" and that there is no record evidence showing that either Dr. Elashker or Dr. Hilmi "engaged in sexual harassment or that any actionable conduct is imputable to them." *Id.*[9] Plaintiff responds that Drs. Elashker and Hilmi may be held liable for their own conduct because they had an ownership interest in HVFP and sufficient control to make personnel decisions. Dkt. No. 49 at 24.

Neither proposition advanced by the parties appears to be an accurate or complete statement of law. First, Plaintiff cites *Patrowich v. Chemical Bank*, 63 N.Y.2d 541, 542 (1984), as standing for the proposition that an individual with ownership interest in the employing entity and control over personnel decisions may be held liable for their own violative conduct under the NYSHRL. However, the New York Court of Appeals clarified *Patrowich*'s holding in *Doe v. Bloomberg L.P.*, 36 N.Y.3d 450 (2021). The Court of Appeals in *Doe* noted that "a corporate employee simply does not qualify as an 'employer'" under the NYSHRL, "regardless of the employee's position or relationship to the employer." *Id.* at 458-59. Thus, regardless of Drs. Elashker and Hilmi's ownership status of HVFP, they cannot be held liable as employers under the NYSHRL. *See, e.g.*, *Kim v. Regeneron Pharms., Inc.*, No. 24-cv-5234, 2026 WL 820603, at *10 (S.D.N.Y. Mar. 25, 2026) (noting that "shareholders, agents, limited partners, and employees" are "not employers" for purposes of the NYSHRL) (quoting *Doe*, 36 N.Y.3d at 459).

---

seek to hold the individual defendants liable under [Title VII]." Dkt. No. 49 at 23. Accordingly, Plaintiff's Title VII claims are asserted only against HVFP.

[9] As set forth above, the Court has rejected Defendants' argument that Plaintiff has not proffered evidence of actionable conduct. The Court also declines to consider Defendants' conclusory assertion that Plaintiff did not follow the complaint procedure set forth in HVFP's employee handbook. In any event, the "Hudson Valley Family Physician Policies and Operations Manual" submitted by Defendants is dated December 8, 2019 and indicates that it is a "Draft copy," Dkt. No. 44-14, and it is therefore unclear when or whether the handbook was ever in effect.

Second, Defendants' argument that an individual cannot be liable for aiding and abetting his own wrongful conduct does not account for Second Circuit precedent holding that such individuals can be held liable for "aiding and abetting allegedly unlawful discrimination by [an] employer even where [an individual defendant's] actions serve as the predicate for the employer's vicarious liability, so long as the employer's conduct has also been found to be discriminatory under the NYSHRL." *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 73 (S.D.N.Y. 2020) (citations and emphasis omitted); *see Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004). Thus, to the extent HVFP is liable under the NYSHRL, the individual defendants could be held liable under an aiding and abetting theory if they participated in the employer's unlawful discrimination.

Thus, in the absence of more helpful briefing, Defendants have not demonstrated their entitlement to summary judgment with respect to Plaintiff's NYSHRL claims against Drs. Elashker and Hilmi.

## IV.     CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motion for summary judgment, Dkt. No. 44, is **DENIED**.

**IT IS SO ORDERED.**

Dated: June 26, 2026

Elizabeth C. Coombe
U.S. District Judge

26